NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 17, 2009
Decided May 11, 2009

**Before**

JOEL M. FLAUM, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

ANN C. WILLIAMS, *Circuit Judge*

No. 08-2310

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District |
| *Plaintiff-Appellee*, | Court for the Central District of Illinois. |
| | |
| *v.* | No. 07 CR 30078 |
| | |
| JASON JOHNSON, | Jeanne E. Scott, |
| *Defendant-Appellant*. | *Judge*. |

**ORDER**

Jason Johnson contends that police violated his rights under the Fourth Amendment when they stopped his vehicle, frisked him, and ultimately uncovered evidence of crime. We disagree.

Illinois Trooper Steven Ent pulled over Johnson at 2:06 p.m., on May 11, 2007, after noticing illegally tinted windows on his SUV. When Ent asked Johnson and the passenger for identification, Johnson became nervous. As Johnson passed over his license, his hand trembled so much that the card "bounce[d] up and down." There was a pretty good reason for this--Johnson was on parole for a drug conviction and was, at the moment at least, less

than faithful to the conditions placed on his release. He had a pistol tucked away in the vehicle, as well as two bags of what looked like crack cocaine (though later testing proved it was just "filler," or a non-illicit cutting agent).

Back at the scene, Ent advised Johnson of the tinting violation and had Johnson wait in the SUV while he returned to his patrol car. Running his name through the computer, Ent discovered Johnson's parole status and "extensive criminal history involving drugs." Combined with Johnson's extreme nervousness, this prompted Ent to radio a K-9 officer, Trooper Anthony Maro, for a possible dog sniff.

Maro showed up quickly, while Ent was still filling out a written warning for the tinting offense. When he finished, Ent approached Johnson and asked him to come to the rear of the SUV so he could explain the write-up. After Johnson signed the warning, Ent asked him why he was on parole. Johnson candidly admitted that it was for drugs, but he said his parole officer knew he was traveling, so everything was kosher. Ent then asked Johnson if he was carry anything illegal; Johnson said he was not. Unsatisfied, Ent asked Johnson for permission to search his vehicle. The answer from Johnson was ambiguous: he said he "wouldn't mind" a search, but that he needed to get on the road because he "was really on a schedule." Finding this insufficiently clear, Ent settled for a dog sniff. He told Johnson that Maro would just walk his canine around the car.

Before that got underway, however, Ent patted Johnson down for officer safety. Ent said this was the prudent thing to do because he was dealing with someone who had an extensive criminal history involving drugs. Ent uncovered a wad of money--$700 to be exact--which Johnson said was for car repairs. Leaving Johnson to the side, Ent ordered the other passenger out of the vehicle and patted her down as well. Before Maro began the walk-around, Johnson told him that the dog would probably alert because a friend had smoked marijuana in the car earlier that day. Sure enough, the dog did just that. Whether due to the smell of marijuana or something else, the dog sat down near the driver's door, signaling the presence of drugs. In the subsequent search, Ent located a box of .22 caliber ammunition inside of a purse on the front seat and, inside a gym sock stashed behind the stereo console, a matching pistol plus two bags of what appeared to be (but was not) narcotics. Maro placed Johnson in handcuffs, and that was, as they say, a wrap.

The whole sequence--from the time Ent pulled Johnson over to the time he found the gun--lasted 27 minutes. (We know this with such exactitude because there was a video camera with a clock in Ent's patrol car.)

The case reaches us on appeal from the district court's denial of a motion to suppress. We review the legal conclusions that went into this ruling *de novo* and the factual findings for clear error. *United States v. Gibson*, 530 F.3d 606, 613 (7th Cir. 2008).

Johnson's argument is straightforward: he concedes the legitimacy of the initial stop, but he says the police did not have grounds to detain him after Ent gave him the warning ticket. He also challenges the frisk. Stated differently, Johnson challenges both the sheer *length* of the detention and something that *occurred* during the detention. We start with the issue of timing.

The Fourth Amendment prohibits unreasonable searches and seizures. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Although the traffic stop in this case was a lawful seizure at the outset, the analysis cannot end there, for "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). More to the point, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* But because the touchstone is reasonableness, the Fourth Amendment does not straightjacket officers who wish to ask questions unrelated to the initial traffic stop. *See United States v. Muriel*, 418 F.3d 720, 725 (7th Cir. 2005). Officers need not even have reasonable suspicion to pursue such questions--as long as, again, the unrelated questions do not unreasonably (or "measurably") prolong the stop. *Arizona v. Johnson*, 129 S. Ct. 781, 788 (2009). It should not be surprising, then, that we have eschewed a stopwatch test (where officers can ask unrelated questions for three minutes, for instance, but no more). *See United States v. Childs*, 277 F.3d 947, 953-54 (7th Cir. 2002) (en banc). Instead, we have employed a common-sense approach, sustaining "[q]uestions that hold potential for detecting crime, yet create little or no inconvenience." *Id.* at 954.

In light of this standard, Johnson's argument based on the length of the detention fails. Although the entire process took 27 minutes, the first 12 minutes or so (through issuance of the written warning) were comprised of activities that Johnson doesn't challenge. By that time, Maro was already on the scene with his dog, and Ent knew that Johnson was on parole for a drug-related offense. The issue, then, is whether the officers unreasonably prolonged the detention by asking Johnson and his compatriot unrelated questions, seeking consent for a search, patting them down, and ultimately running the dog around the vehicle. Five minutes passed from the time Johnson signed the written warning to the time the dog alerted to the presence of drugs (and when that happened, the officers had probable cause to search and arrest). But even that overstates the relevant time, because Johnson told Maro just two minutes after he signed the written warning that

someone had smoked marijuana in the car that day.  Once Johnson made that admission, there was additional reason to prolong the stop to allow the dog sniff.  *See United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005) ("[I]nformation lawfully obtained during [a traffic stop] may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation.").  So when it comes down to it, what we are talking about here is roughly two minutes of delay that were not justified by the traffic violation or Johnson's statements.  That is not unreasonable.  And any issue regarding the patdown is academic as the frisk didn't yield the evidence at issue or unnecessarily prolong the detention.

The district court's decision is AFFIRMED.