MANION, Circuit Judge.
During a traffic stop, a deputy sheriff frisked the car’s passenger, Christopher Tinnie, and discovered a gun and ammunition. A grand jury indicted Tinnie for possession of a firearm by a felon. Tinnie sought to suppress the gun, ammunition, and statements he made following his arrest. The district court denied his motion to suppress and Tinnie then entered a conditional plea of guilty. Tinnie now appeals from the district court’s denial of his motion to suppress. We affirm.
I.
On Friday, January 30, 2009, Winnebago County Sheriff Deputies Dennis Hill and Brad Kaiser were working a 4:00 p.m.-4:00 a.m. shift, patrolling in a “weed and seed area” of Rockford, Illinois. A “weed and seed area” is an area designated by state and local officials based on a high crime rate and gang, drug, and gun activity. Kaiser was part of a Special Focus Unit which focused on areas with higher crime tendencies. At around 11:30 that evening, the officers observed a black Hyundai Sonata with a mass of air fresheners hanging from its rearview mirror. That normally might not attract law enforcement’s attention, but the strategy in a “weed and seed area” is proactive policing through increased traffic enforcement, and the hanging air fresheners constituted an “obstructive view” justifying a stop. Before the officers stopped the car, though, the driver abruptly turned left and then into a driveway. The officers testified that they believed the driver was attempting to avoid being stopped.
After stopping the vehicle, the officers approached the car. As he walked up to the passenger side, Kaiser noticed Tinnie fidgeting left to right and back and forth in the passenger’s seat. While Hill spoke with the driver, Kaiser asked Tinnie for his identification. Tinnie responded that he didn’t have a license but did have an identification card. But then when Kaiser asked for that, Tinnie merely moved his hands down the front of his coat and pinched his jeans (he did not actually put his hands inside his coat or pants pockets to check) before saying he did not have an identification card. Kaiser commented that Tinnie had never actually checked his pockets for his identification card, but Tinnie merely responded that “he didn’t have his ID on him.” The officer then asked the passenger for his name, birth date, and age. Tinnie identified himself as Christopher Tinnie, gave a birth date of June 16, 1981, and told the officer that he was 28. But as Kaiser immediately realized, “with the date of birth that he had given me, he could have only been 27 at the time.” And at the suppression hearing, Kaiser explained that, in his experience, individuals who are unable to provide the correct age to match their birth date are lying either about their name or their date of birth.
*751 At this point, Kaiser told Tinnie to exit the car. Kaiser later testified that at the time he asked Tinnie to get out of the car he had already decided to frisk him and in fact that he frisks anyone he asks to exit a vehicle during a traffic stop. After Tinnie exited the car, Kaiser informed Tinnie he “was going to pat him down for officer safety” and asked “him if he had anything on him that he shouldn’t have as far as weapons or drugs.” Tinnie didn’t respond. Kaiser slightly rephrased the question, asking Tinnie if he had any weapons, guns, or anything that would poke Kaiser’s hand. Again, Tinnie did not answer. But when Kaiser questioned Tinnie a third time, asking solely whether he had any drugs, “Tinnie immediately said ‘no.’ ” At this point, Kaiser proceeded to frisk Tinnie and discovered a gun and a magazine with three rounds of ammunition. The officers arrested Tinnie, and after a search of the car revealed no other weapons or drugs, they gave the driver a warning about the obstructed view and allowed her to leave.
The officers transported Tinnie to the Winnebago County Criminal Justice Center where, according to Hill, he Mirandized Tinnie. Tinnie then voluntarily provided a handwritten and initialed statement acknowledging his possession of the firearm. A grand jury later indicted Tinnie for possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Tinnie moved to suppress the gun, ammunition, and his written statement. He argued the frisk was unconstitutional and the written statement was the fruit of the illegal search and also obtained without the benefit of a Miranda warning. The district court denied the motion to suppress, concluding reasonable suspicion justified frisking Tinnie and that Tinnie had in fact received a Miranda warning. Tinnie then entered a conditional plea of guilty, reserving the right to appeal the denial of his motion to suppress and the sentence imposed. The district court then sentenced Tinnie to 84 months in prison. Tinnie appeals.
II.
On appeal, Tinnie claims that the district court erred in denying his motion to suppress because reasonable suspicion did not justify the frisk and therefore the fruit of the illegal search (i.e., the gun, ammunition, and his later inculpatory statement) was inadmissible.[1] We review de novo the district court’s legal determination of the constitutionality of a frisk and its findings of fact for clear error. United States v. Oglesby, 597 F.3d 891, 893 (7th Cir.2010).
During a valid traffic stop, an officer may order the driver and passengers out of the vehicle without violating the Fourth Amendment. Pennsylvania v. Mimms, 434 U.S. 106, 112 n. 6, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); Maryland v. Wilson, 519 U.S. 408, 412, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). The officers may also frisk the driver and any passengers upon reasonable suspicion that they may be armed and dangerous. Arizona v. Johnson, 555 U.S. 323, 129 S.Ct. 781, 787, 172 L.Ed.2d 694 (2009). Whether an officer has a reasonable suspicion to support such a frisk “is a fact-specific inquiry that looks at the ‘totality of the circumstances’ in light of common sense and practicality.” United States v. Robinson, 615 F.3d 804, 807-08 (7th Cir.2010). In determining whether an officer had reasonable suspicion, courts consider “the circumstances known to the officer at the time of the *752 stop, including the experience of the officer and the behavior and characteristics of the suspect.” United States v. Lawshea, 461 F.3d 857, 859 (7th Cir.2006). The time and the location of the stop are also relevant to the reasonable suspicion inquiry. Oglesby, 597 F.3d at 893.
In this case, the totality of the circumstances justified frisking Tinnie. The stop occurred late on a Friday night in a high-crime neighborhood. And Kaiser testified at the suppression hearing that the driveway into which Tinnie had pulled was “dimly lit just from road lighting.” See, e.g., Oglesby, 597 F.3d at 893 (holding that the totality of the circumstances justified a frisk, in part, because it “occurred at night in a location that was known to the officers to be a high-crime area plagued by drug trafficking and gun violence”). Kaiser was part of a Special Focus Unit charged with patrolling higher crime areas and, as the district court found, was thus familiar with the risk of gun possession in that area. See United States v. Lawshea, 461 F.3d 857, 859 (7th Cir.2006) (holding that the experience of the officer is a factor considered in judging whether reasonable suspicion justifies a frisk). As the district court also found, Tinnie acted suspiciously by moving around nervously as the officers approached the car. See, e.g., United States v. Brown, 273 F.3d 747, 748-49 (7th Cir.2001) (finding that the totality of the facts, including the defendant’s “movements in the car,” justified “a limited pat-down for weapons”). Then, after stating he had an identification card, Tinnie told Kaiser (without checking his pockets) that he did not have the identification card. See, e.g., Cady v. Sheahan, 467 F.3d 1057, 1061-62 (7th Cir.2006) (noting that evasive responses to police questions can help support reasonable suspicion). Tinnie also stated he was 28 and Kaiser immediately perceived that “with the date of birth that he had given me, he could have only been 27 at the time.” See, e.g., United States v. Marrocco, 578 F.3d 627, 633-34 (7th Cir.2009) (concluding that inconsistent answers to the officer’s questions was a factor supporting reasonable suspicion that a suitcase contained drugs); United States v. Thomas, 87 F.3d 909, 912 (7th Cir.1996) (stating that defendant’s contradictory answers to simple questions was a factor supporting reasonable suspicion justifying detention of defendant’s suitcase.) And before frisking Tinnie, Kaiser asked him whether he had any weapons or drugs and Tinnie did not respond. Kaiser rephrased the question slightly, asking Tinnie “if he had any weapons on him, any guns, or anything that would poke my hands.” Again, Tinnie did not respond, but when Kaiser then asked if Tinnie had any drugs on him, Tinnie immediately said no. Coupled with the earlier suspicious circumstances, Tinnie’s silence when twice asked if he had any weapons, but his immediate denial of possessing drugs, provided Kaiser with reasonable suspicion that Tinnie was armed and thus justified the frisk.
It is true that Kaiser testified that when he asked Tinnie to step out of the car, he had already decided to frisk him. The district court believed the high-crime neighborhood and the lateness of the hour, along with Tinnie’s suspicious movement as the officers approached the car, his strange behavior when asked for his identification, and the inconsistent date of birth and age were enough to justify the frisk. That may well be, given that we judge the totality of the circumstances “in light of common sense and practicality.” Robinson, 615 F.3d at 807-08. Common sense tells us that an officer faced with Tinnie’s suspicious behavior during a late-night stop in a high-crime neighborhood would find it totally sensible to perform a frisk to protect himself and his partner. See, e.g., Oglesby, 597 F.3d at 893 (holding frisk justified where it “occurred at night in a location that was known to the officers to be a high-crime area plagued by drug traf *753 ficking and gun violence” and where defendant moved away from the crowd as officers approached and dropped his hand to his pants pocket). But we need not rest on those circumstances because Kaiser testified at the suppression hearing that before he frisked Tinnie, he had asked Tinnie whether he had any weapons or drugs. And as recounted above, Tinnie did not respond to the repeated questions about weapons but immediately responded “no” when asked about drugs. The Supreme Court has made clear that in judging the constitutionality of a search or seizure, courts must look at the facts objectively. Whren v. United States, 517 U.S. 806, 812-13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (collecting cases). Thus, “[i]t is important to remember that we are not limited to what the stopping officer says or to evidence of his subjective rationale; rather, we look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious.” United States v. Brown, 232 F.3d 589, 594 (7th Cir.2000) (internal quotation marks and citations omitted; emphasis added). Thus, it is irrelevant that Kaiser decided to frisk Tinnie before directing him to exit the car. Similarly, it is also irrelevant that Kaiser testified that he frisks anyone he asks to step out of a vehicle during a traffic stop.[2] The question is rather whether given all of the facts known to Kaiser, a reasonable officer would have believed the frisk was justified. Given everything that took place prior to the frisk,[3] as well as the time and location of the stop, a reasonable officer could conclude that there was reasonable suspicion that Tinnie was armed and that a frisk was necessary to assure the officers’ safety. Accordingly, the frisk was constitutional and the district court properly denied Tinnie’s motion to suppress.[4] We Affirm.

. Tinnie does not challenge the district court's conclusion that he received his Miranda warnings prior to providing his written statement. This issue is thus not on appeal. Tinnie also does not challenge his sentence on appeal, although he had reserved the right to do so in his conditional plea.

. Tinnie argues that because Kaiser routinely frisks occupants whom he has directed to exit the vehicles, Kaiser engages in unconstitutional automatic frisks. There are two flaws with this argument: First, as just noted, the reasonable suspicion analysis is an objective one — so Kaiser's subjective intent is irrelevant. Second, Kaiser did not testify that he routinely asks everyone he stops to exit the vehicle. Thus, it may well be that Kaiser only directs occupants to exit the stopped vehicle if there is already reasonable suspicion to believe they are armed and dangerous. The dissent finds this possibility highly improbable but, as the dissent recognizes, many routine traffic stops occur "while the drivers and passengers remain inside the vehicle (and are often warned not to try to exit the vehicle).” Dissent at 755 n. 3. There is nothing to indicate that Kaiser handles traffic stops any differently than the typical officer, i.e., in most cases directing drivers and passengers to remain inside the vehicle. But if, in fact, there was some evidence that Kaiser has a higher rate of exit-requests and frisks than the typical officer, it likely stems from the more dangerous environment he faces in working the 4 p.m.-4 a.m. shift as a member of the Special Focus Unit, patrolling high-crime neighborhoods. Absent some support in the record to the contrary, we should not imply that Kaiser regularly engages in unconstitutional conduct.

. The dissent asserts that because "[t]he frisk had begun by the time Deputy Kaiser asked Tinnie whether he had any weapons or drugs,” his responses are irrelevant to the Terry analysis and should be disregarded. Dissent at 759. However, the record makes clear that Kaiser asked Tinnie whether he had any weapons or drugs before the frisk had begun; Kaiser testified at the suppression hearing that this questioning took place before he "touched [Tinnie], before any interaction with his body took place.” And the district court found — and that finding was not clearly erroneous — that this questioning occurred before Kaiser conducted the frisk.

. While there may well be other cases in which officers engage in unreasonably intrusive law enforcement practices, Dissent at 761, this is not that case. Rather, this case illustrates how proactive policing, within constitutional limits, successfully "weeds” dangerous criminals from the street while provid *754 ing law-abiding citizens the protection they deserve.